**E-FILED**
Friday, 25 September, 2009  08:50:38 AM
Clerk, U.S. District Court, ILCD

### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS - SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LINDA ANGELES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  08-3194 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>OPINION</u>

CHARLES H. EVANS, U.S. Magistrate Judge:

Plaintiff Linda Angeles appeals from a final decision of the Social Security Administration (SSA) denying her application for Disability Insurance Benefits (DIB) and Supplemental Social Security Income (SSI) under Chapters II and XVI of the Social Security Act, 42 U.S.C. §§ 416, 423, and 1381a.  Angeles brings this appeal pursuant to 42 U.S.C. § 405(g). The parties have consented to a determination of this case by the United States Magistrate Judge, pursuant to 28 U.S.C. § 636.  <u>Order (d/e 13) dated Feb. 24, 2009</u>.  Angeles has filed a motion for summary judgment pursuant Local Rule 8.1(D), and the Commissioner has responded.      <u>Motion for</u>

Summary Reversal (d/e 14); Response to Motion for Summary Judgment (d/e 17).)  For the reasons set forth below, the Court determines that the SSA's decision is supported by the law and the evidence.  The Plaintiff's Motion for Summary Reversal (Motion) is DENIED, and the decision of the Commissioner is AFFIRMED.

FACTS

Plaintiff Linda Angeles applied for DIB and SSI on January 25, 2005.  (Social Security Tr. (d/e 11) at 112, 382.)   At that time, she was fifty-four years old.    Angeles alleged that, as of April 15, 2004, severe panic attacks, bronchial spasms, emphysema, and chronic obstructive pulmonary disease (COPD) had rendered her unable to work.  (Tr. at 69.) The SSA denied her claims initially and on reconsideration.  (Tr. at 73, 66.) Angeles requested a hearing, which was held January 24, 2008.  (Tr. at 60, 387.)  On February 21, 2008, an Administrative Law Judge (ALJ) found that Angeles was not disabled for purposes of SSI and DIB.  (Tr. at 52.) The Appeals Council denied Angeles's request for review (Tr. at 4), and Angeles now seeks judicial review.

I.    MEDICAL HISTORY

Angeles alleges that her mental health difficulties began in 1980.[1] (Tr. at 150.) She began mental health treatment at the Springfield Mental Health Center at some point prior to October 22, 2003. (Tr. at 13.) On that date, Angeles went to the Springfield Mental Health Center to consult with Advanced Nurse Practitioner Mary Conklen (Conklen) about treatment for depression. (Id.) At the appointment Angeles reported that, while she felt like things were going well for her, she was having difficulties with panic attacks and mood swings. (Id.) Conklen gave Angeles a Global Assessment of Functioning (GAF) score of 60 and prescribed Lexapro for her. (Tr. at 14.) Conklen also continued Angeles on Xanax. (Id.)

Angeles went back to see Conklen on January 13, 2004. (Tr. at 260.) At the appointment, Angeles reported that her job was making her anxious and that she was looking for new work. (Id.) She had stopped taking the Lexapro because of how it made her feel, and stated that she didn't feel like she needed to continue taking an antidepressant medication. (Id.) Angeles told Conklen that she was sleeping well and had no major concerns. (Tr. at

---

[1]Because Angeles does not dispute the ALJ's conclusions regarding Angeles's physical difficulties, the Court will not address her history of physical illness.

260.)  Conklen chose to discontinue the Lexapro and to continue the Xanax, and assigned Angeles a GAF score of 60.  (Id.)

On April 6, Angeles returned to see Conklen, and reported that she was still working at the same job, was doing well, and was not experiencing any depressive symptoms.  (Tr. at 258.)  Although she was worried about her husband's heart problems, Angeles said that she was eating and sleeping well.  (Id.)  Conklen gave Angeles a GAF score of 65 and chose to continue her on the Xanax.  (Tr. at 258, 259.)

Angeles's  next visit to Conklen was on June 29.  (Tr. at 256.)  Angeles reported that her mother had been diagnosed with cancer.  (Id.)  Angeles had quit her job in order to be her mother's primary care provider while she underwent chemotherapy.  (Id.)  Angeles described significant trouble sleeping,  noting that she was only able to sleep for two hours at a time and that, on some nights, she was only able to get a total of two hours of sleep.  (Id.)  Aside from her sleep problems, Angeles felt that she was handling her difficult situation well.  (Id.)  Conklen gave her a GAF score of 65 and chose to continue her on the Xanax.  (Tr. at 256, 257.)  Conklen also started Angeles on Trazodone for her insomnia.  (Tr. at 257.)

Angeles returned to Conklen on September 14 of 2004.  (Tr. at 15.)

Angeles stated that she was both caring for her husband and taking her mother to her chemotherapy appointments. (Tr. at 15.) She said that she was still having trouble sleeping, getting about four hours of sleep a night, and was suffering from a lack of energy. (Id.) Angeles also indicated that she felt like she could not hold a job down for very long because she eventually reached the point where she could not stand being around other people. (Id.) Conklen recommended that Angeles try antidepressant treatment but Angeles refused. Conklen gave Angeles a GAF score of 65 and continued her on the Xanax. (Tr. 15, 16.)

Angeles's next visit to Conklen was on December 7, 2004. (Tr. at 17.) Angeles reported that she was very busy caring for her mother and for her husband, who had suffered two myocardial infarctions. (Id.) She still was having sleep problems and suffered from low energy and irritability. (Id.) She was using Tylenol PM to help her sleep. (Id.) Conklen again recommended antidepressant medication to Angeles, but Angeles again refused. (Tr. at 18.) Conklen gave Angeles a GAF score of 60. (Tr. at 17.)

On January 25, 2005, Angeles applied to the SSA for DIB and SSI. (Tr. at 112, 382.) Angeles had previously filed a claim for DIB on April 15, 2000. (Tr. at 117.)

5

On February 20, 2005, Angeles's mother, Betty Prior (Prior), completed a "Function Report" about Angeles for the SSA.  (Tr. at 178.) In this report, Prior described Angeles's regular activities and abilities.  (Id.) Prior stated that Angeles's illnesses caused her to experience trouble with sleeping, working, and being around other people.  (Tr. at 179.)  Prior also stated that, at that time, Angeles was not taking care of any other people or pets.  (Id.)  Prior stated that Angeles normally prepared her own meals and that she was able to do some housework, such as light cleaning, dusting, and laundry, once a week.  (Tr. at 180.)  Prior reported that Angeles was able to leave the house by herself and to drive a car, but that she was unable to do these things when her anxiety was bad.  (Id.)  Prior noted that Angeles was able to do her own grocery shopping, and that the two occasionally went to church together.  (Tr. at 181.)  According to Prior, Angeles's main interests were reading and watching television.  (Id.)

The next day, February 21, Angeles completed an "Activities of Daily Living" Questionnaire for the SSA.  (Tr. at 174, 170.)  Angeles reported that she cooked her own meals and that she was able to do light cleaning, dusting, and laundry once a week.  (Tr. at 170.)  She stated that she did not go shopping, and that she only left home when she had to

because, although she could drive a car, her anxiety often made this difficult for her. (Tr. at 172.) She also described feeling anxious when she was around other people. (Id.) Angeles reported that she often read and went to church, and that she sometimes watched television and went out to eat. (Tr. at 173.)

When Angeles returned to Conklen on March 1, 2005, she reported that her condition was roughly the same as before. (Tr. at 19.) She said that she was still having sleep problems. (Id.) Although Angeles had stopped taking the Trazodone, she felt that she needed to resume the medication because her lack of sleep was affecting her functioning. (Id.) Conklen gave Angeles a GAF score of 60, continued Angeles on Xanax, and prescribed her more Trazodone. (Tr. at 19, 20.)

On March 22, 2005, the SSA sent Angeles to Michael Trieger (Trieger), a licensed clinical psychologist, for a psychological evaluation. (Tr. at 212-15.) Trieger both reviewed the records from Angeles's appointments with Conklen during 2004 and saw Angeles in person. (Tr. at 212.) Angeles reported that she had been suffering from panic attacks for twenty years, and stated that there was a history of bipolar disorder in her family. (Tr. at 213.) She said that, while she had been prescribed

antidepressants on several occasions, she had never taken them for very long because she did not like how they made her feel. (Id.) Angeles told Trieger that, while she occasionally helped with laundry and making the bed, she generally tried to do "as little as possible." (Id.) She stated that her preferred leisure activities included watching television, reading, and taking her dog for a walk. (Id.) Angeles suggested that she might suffer from bipolar disorder, but Trieger rejected this diagnosis, stating that her history indicated that she was suffering from depression and panic disorder. (Tr. at 214.) Trieger gave Angeles a GAF score of 58. (Tr. at 215.)

On May 4, 2005, the SSA had psychologist Margaret Wharton (Wharton) evaluate Angeles's records. (Tr. at 265, 267, 277.) Wharton found that Angeles suffered from some difficulties with anxiety, particularly in socially demanding contexts, but that these difficulties would not markedly limit her in any job tasks. (Tr. at 265-67.) Wharton specifically found that Angeles had "the capacity to perform and sustain simple tasks which have few social demands." (Tr. at 267.) Wharton also evaluated Angeles according to the criteria of Social Security Listings 12.04 and 12.06, but found that Angeles did not meet these Listings because she

was only moderately restricted in participating in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. at 287.) Wharton also found that Angeles had not experienced any extended episodes of decompensation. (Id.)

On May 19, 2005, Yan Haiyan wrote an assessment of Angeles's employment potential for the SSA. (Tr. at 133.) Yan stated that, based on Wharton's assessment of Angeles's psychological condition, and based on an assessment of Angeles's physical health performed on May 18, Angeles would be able to perform work that did not require sustained interaction with other people and that did not involve exposure to fumes or gases. (Id.) Yan identified several jobs that fit these limitations and noted that there were substantial numbers of these jobs available in Illinois. (Id.) He accordingly concluded that Angeles was not disabled for Social Security purposes. (Id.)

Angeles again visited Conklen on May 20, 2005. (Tr. at 22.) At the visit, Angeles reported having gone to see a primary physician, Dr. Cumpa, for the first time in many years. (Id.) Dr. Cumpa recommended that Angeles try antidepressants. (Id.) Angeles reported to Conklen that her weight had increased, that she lacked energy and motivation, and that

she was very irritable and easily angered. (<u>Id.</u>)  Angeles stated that she was only getting two to three hours of sleep a night and that she had not been able to afford to get her prescription for Trazodone filled.  (<u>Id.</u>) Conklen gave Angeles a GAF score of 55-60 and recommended that she try a tricyclic antidepressant. (Tr. at 23.)  Conklen gave her a prescription for Elavil and continued her on Xanax.  (<u>Id.</u>)

On June 1, 2005, the SSA sent Angeles a letter explaining that it was denying Angeles's claims for DIB and SSI because she was not disabled under the SSA's rules.  (Tr. at 73.)  Angeles requested that the SSA reconsider her claims.

On August 24, 2005, Angeles returned to see Conklen.  (Tr. at 24.) Angeles reported that she had been taking the Elavil and that it had helped her greatly in reducing her anxiety level and enabling her to sleep normally. (<u>Id.</u>) Angeles also noted that the Elavil had enabled her to go outside more often, and the difference Elavil had made for her as "amazing;" Conklen noted that Angeles was "much improved."  (<u>Id.</u>)  In spite of these apparent improvements, Conklen assigned Angeles a GAF score of 50 (<u>Id.</u>), which was five to ten points lower than her GAF scores from her previous visits.

The SSA requested that consultant Kirk Boyenga reevaluate

Angeles's mental condition in connection with her request for reconsideration of the case. (Tr. at 262, 263.) On September 13, 2005, Boyenga affirmed Wharton's May 4 determination as written. (Tr. at 262.)

On September 15, the SSA sent Angeles a letter explaining that, after reconsideration of her case, it had decided to again deny her DIB and SSI benefits. (Tr. at 66.) One week later, on September 22, Angeles's attorney requested that her case be heard by an ALJ. (Tr. at 65.)

On November 16, Angeles again went to see Conklen. (Tr. at 26.) Angeles described her mood as good and did not report any major changes in her condition. (Id.) Conklen gave Angeles a GAF of 50 and told Angeles to continue on the Xanax and Elavil. (Id.) When Angeles returned to Conklen's office on February 15, 2006, Angeles described herself as being under a great deal of stress due to caring for her mother and brother, but also reported that she was better able to deal with stress than she had been in the past. (Tr. at 27.) Conklen again assigned Angeles a GAF score of 50, and continued her on the Xanax and Elavil. (Id.)

When Angeles next visited Conklen, on May 11, 2006, she reported that she continued to care for her family and that she was tired, but that she felt she could tolerate stress better than she could in the past. (Tr.

at 28.)  Although Angeles was pleased about her ability to sleep normally, she  did express concern about her continuing to experience panic attacks. (Id.)  Overall, Angeles said that, on a  scale  running from one to ten, her mood was a five.  (Id.)  Conklen gave Angeles a GAF score of  50, and told her to continue on the Xanax and Elavil.  (Id.)

When  Angeles  visited  Conklen  next on August 3, 2006, Angeles said that she was doing well, but was often tired and forgetful, and that she often suffered from a dry cough.  (Tr. at 28.)  Angeles also noted that she still had occasional difficulties with poor sleep.   (Id.)   Conklen recommended that Angeles try to reduce her intake of Xanax by at least one tablet a month, and gave her a GAF score of 50.  (Id.)

Angeles saw Conklen again on October 26, and reported that she continued to have stress from her family.   (Tr. at 28.)   Angeles had increased her dosage of Elavil, but noted that she was generally doing a satisfactory job of coping with her difficulties.  (Id.)  Conklen indicated that Angeles's affect was "blunted and constricted," and gave her a GAF score of 50.  (Id.)

On that same day, Conklen completed a SSA Listing of Impairments form evaluating Angeles in terms of SSA Listing 12.04, which defines

disability caused by affective disorders.   (Tr. 37, 38.)   On this form, Conklen claimed that Angeles satisfied the criteria of the listing because she suffered from a depressive disorder characterized by sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking, and because Angeles had suffered repeated episodes of decompensation, each of an extended duration. (Tr. at 38.) However, Angeles did not submit this form to the SSA until January 25, 2008, the day after her hearing was held. (Tr. at 36, 387.)

On January 11, 2007, Angeles had another appointment with Conklen. (Tr. at 31.) Angeles reported that she had been feeling more depressed than in the recent past because her husband had been having more medical difficulties, and because her own disability had been denied. (Id.) She expressed that she tended to feel more depressed during the winter. (Id.) Angeles was having more difficulty getting to sleep, but noted that she had also been sleeping later in the morning. (Id.) Conklen gave Angeles a GAF score of 50, increased her dosage of Elavil, and continued her on Xanax. (Id.)

At the next appointment with Conklen, on April 5, Angeles reported that she had experienced continued stress, depressive symptoms,

and sleep problems, and that she had increased the amount of Elavil she was taking. (Tr. at 32.)  Conklen gave Angeles a GAF score of 50 and continued her on the Xanax and Elavil.  (Id.)

On June 28, 2007, Angeles again saw Conklen.  (Tr. at 33.)  Angeles reported that her brother-in-law had recently died, but that she had done a good job of coping with it.  (Id.)  She said that her mood had been good on the medications, and that the medications had enabled her to be more active during the day.  (Id.)  Conklen gave Angeles a GAF score of 50, and continued her on the Elavil and Xanax.  (Id.)

On August 23, 2007, Angeles visited Dr.  Gabor Matos (Matos) complaining of chest pain.  (Tr. at 340.)  During the course of the visit, Angeles told Dr. Matos that she was "able to do quite vigorous activities around her house." (Id.)

Angeles's final appointment with Conklen for which the Court has records was on October 16, 2007.  (Tr. at 34.)  Angeles reported that her visits to therapist Tisha Bayless (Bayless) had been helpful, but that she was still experiencing irritability and social anxiety. (Id.)  Angeles said that her moods varied significantly with the time of day, and with the seasons.  (Id.)  Conklen gave Angeles a GAF score of 55, five points higher

than her previous GAF score, and continued her on Xanax and Elavil. (Tr. at 33,34.)

Three days later, on October 19, 2007, Bayless completed a comprehensive assessment of Angeles's mental health. (Tr. at 357, 363.) This assessment described a number of positive trends in Angeles's mental health, including decreased anxiety and depression, improved interactions with family members, and an improvement in her self esteem that Angeles described as "amazing." (Tr. at 357, 364.)

## II. ADMINISTRATIVE HEARING

Angeles's administrative hearing with the SSA took place on January 24, 2008. (Tr. at 391.) Angeles, who testified at the hearing, was fifty-seven years old at the time. She lived in a mobile home with her husband, Tom Angeles. (Id.) She indicated that her mother had driven her to the hearing. (Tr. at 392.) Angeles testified that the Angeles family's only source of income was Tom's Social Security retirement payments. (Tr. at 393.) She told the ALJ that she had completed school through the tenth grade, and that she had not obtained a GED. (Tr. at 394.)

Angeles's last job was in 2006, when she worked part-time cleaning a bar. (Tr. at 396.) Angeles had to leave the bar because working there

caused her to experience a violent temper.  (Tr. 395, 396.)  Angeles informed the ALJ that most of her past work experience came from working at dry cleaners, but that she had also worked as a prep cook at a nursing home and as a cashier at a couple of stores.  (Tr. at 396, 397.)

Angeles also testified regarding her daily activities.  (Tr. at 397.) She said that she does very little beyond occasionally reading or watching television.  (Id.)  She denied cooking for herself and said that she sometimes attempted to do the laundry, but that she generally needed her husband's help to finish it.  (Id.)  Angeles denied visiting anyone other than her mother, and said that she had not driven in six months  because  she frequently  suffered  panic  attacks while driving.  (Tr. at 398-399, 415.) She described being able to deal with her own hygienic needs, although she felt she did not do so as often as she should.  (Tr. at 400.)  She stated that she had not drunk alcohol since 2001.  (Tr. at 400, 401.)  This statement is inconsistent with Bayless's report from 2007, which said that "[r]ecently Linda  has  admitted to drinking a box of wine over the course of a week or two."  (Tr. at 364.)

During the hearing, Angeles answered questions about the factors that

would prevent her from going to work if she were offered a job.  (Tr. 401.)
Angeles indicated that she would get upset if there were a large number  of
people at the work, and that she would have difficulty going to and
from work.  (<u>Id.</u>)  She said that she only left the house to go to the doctor.
(Tr. at 402.)

Angeles also testified about her sleeping habits, noting that the Elavil
had lost its efficacy in helping her sleep, and that she was back to sleeping
poorly.  (Tr. at 409.)  She said that she did nothing to take care of her
mother and husband and that they, in fact, were the ones caring for her.
(Tr. at 404.)    Angeles said that she had feelings of guilt and
worthlessness, difficulty concentrating, and panic attacks.  (Tr. at 412,
413.)   She also described crying spells, mood swings, and depressive
episodes so bad that she stayed in bed for days.  (Tr. at 413, 414.)  She
described herself as having been diagnosed as bipolar.  (Tr. at 414.)   When
the ALJ asked Angeles about Dr. Matos's notes regarding her ability
to do vigorous activities around the house, Angeles disputed that she had
made such a comment.  (Tr. at 416.)

At the end of the hearing, vocational expert Bob Hammond
(Hammond) testified regarding Angeles's ability to work.  (Tr. at 417.)

Hammond testified that he read Angeles's record, and used this record to identify her relevant work experience. (Tr. at 419.) Hammond said that Angeles had previously worked as a dry cleaner worker, cashier, and cook. (Tr. at 419.) The ALJ asked Hammond to consider a hypothetical person with Angeles's age and educational background, and to imagine that this person would need an accommodation for unskilled work with only occasional interaction with the public, with no concentrated exposure to fumes, gases, or any respiratory irritants, with no work above the head with the non-dominant arms, and with no climbing ladders, ropes or scaffolding. (Tr. at 419.) Hammond said that such a person would not be able to perform any of Angeles's previous jobs, but that this person would be able to work as a hand packer, sandwich maker, or day worker cleaner. (Tr. at 419, 420.) Hammond further testified that there were thousands of people working these jobs in Illinois. (Tr. at 420.) However, Hammond did note that, of these jobs, only a day worker cleaner would be able to take multiple unscheduled breaks during the day for panic attacks, and that none of these jobs would allow Angeles to miss three or more days a month without advance notice. (Tr. at 421.)

The ALJ found on February 21, 2008, that Angeles was not disabled

for SSI and DIB purposes, and the Appeals Council affirmed this decision on July 25, 2008.   On September 15, 2008, Angeles filed this suit.

ANALYSIS

Angeles asks the Court to review the ALJ's decision on three grounds. First, she argues that the ALJ violated Social Security Rulings (SSRs) by not taking into account Conklen's opinions.  Angeles next claims that the ALJ's determination of her work capacity was erroneous and not based on the facts.  Finally, Angeles asserts that the ALJ's findings were against the manifest weight of the evidence.

Judicial review of the Commissioner's final determination of disability is limited, and the Commissioner's findings of fact are treated as conclusive as long as they are supported by substantial evidence.  42 U.S.C. § 405(g); Halbrook v. Chater, 925 F. Supp. 563, 571 (N.D. Ill. 1996). "Substantial evidence" means evidence that "a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000). On review, courts may not reevaluate evidence, make new factual determinations, or substitute their judgment for that of the Commissioner. Powers, 207 F.3d at 434-35. Nonetheless, the court must

19

look to the record as a whole to determine if "substantial evidence" for the ALJ's decision exists.  Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985).

As a general rule, an ALJ's opinion need not evaluate "every piece of testimony and evidence submitted."  Zalewski v. Heckler, 760 F.2d 160, 166 (7th Cir. 1985).  All that is required is that the ALJ "considered the important evidence" in the opinion, thus allowing the courts to "trace the path of the ALJ's reasoning."  Stephens, 766 F.2d at 287.

With these standards in mind and for the reasons described below, the Court finds that the ALJ's decision was supported by substantial evidence.

I.   VIOLATION OF SSR 96-2p

Plaintiff Angeles first argues that the ALJ violated SSR 96-2p by rejecting her "treating sources [sic] opinion."  (Br. in Supp. of Pl.'s Mot. for S. Reversal (d/e 15) (Br.) at 2.)  Angeles asserts that she met the impairment criteria contained in Listing 12.04, and that the ALJ's decision not to give Conklen's opinion regarding Listing 12.04 "controlling weight" was not supported by substantial evidence.  (Br. at 7.)

In determining whether an individual is disabled for Social Security

purposes, the ALJ uses the five-step sequence outlined in 20 C.F.R. § 416.920(a).  Each step must be satisfied before moving on to the next step.  First, the ALJ determines if the claimant engages in "substantial gainful activity," (SGA) defined as work that involves significant physical or mental activities, usually done for pay or profit.  20 C.F.R. §§ 416.920(b), 416.972(a)-(b).  If the claimant is not involved in SGA, step two requires the ALJ to decide whether the claimant has a medically determinable impairment that is "severe," or a combination of impairments that, taken together, are "severe."  20 C.F.R. § 416.920(c).  Severity is measured by whether an impairment significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 416.921; SSRs 85-28, 96-3p, 96-4p.  If such an impairment is found, the ALJ proceeds to step three.

In step three, the ALJ evaluates whether the claimant's impairment meets criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the ALJ decides in the affirmative, the claimant is disabled.  If the claimant's condition is not equivalent to a Listing, the ALJ moves on to step four.  Step four requires the ALJ to determine the claimant's residual functioning capacity (RFC).  The ALJ considers all impairments, not just those found to

21

be severe under step two.  20 C.F.R. § 416.945.  The ALJ then determines whether the claimant has the RFC to perform past relevant work.

If the claimant is not able to perform past relevant work, the ALJ moves to step five, where she evaluates whether the claimant is capable of performing other work.  20 C.F.R. § 416.920(g).  The ALJ takes into consideration the claimant's RFC, age, education, and work experience. At this juncture, the SSA is responsible for producing evidence that demonstrates that there is work suitable for the claimant in the national economy.  20 C.F.R. §§ 416.912(g), 416.960(c).  If the ALJ determines that there is other work available to the claimant, the claimant is not disabled for purposes of SSI or DIB.

Here, the ALJ determined that Angeles had not been engaged in SGA since April 15, 2004, and that she had several severe impairments, including depression, anxiety, left shoulder impairment, and asthma. (Tr. at 46.)  However, when the ALJ reached step three, she found that Angeles failed to satisfy the criteria for a physical impairment, and that her mental impairments did not meet the requirements contained in either Listing 12.04 or 12.06.  (Tr. at 47.)

Under Listing 12.04, governing affective disorders, Paragraph B

requires that a mental impairment result in two of four scenarios, or that the claimant meet the Paragraph C criteria:

B.    Resulting in at least two of the following:

    1.    Marked restriction of activities of daily living; or

    2.    Marked difficulties in maintaining social functioning; or

    3.    Marked difficulties in maintaining concentration, persistence, or pace; or

    4.    Repeated episodes of decompensation, each of extended duration;

Or

C.    Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychological support, and one of the following:

    1.    Repeated episodes of decompensation, each of extended duration; or

    2.    A residual disease process that has resulted in such marginal adjustment  that  even a minimal increase in mental demands or

change in the environment would be predicted to cause the individual to decompensate; or

3.     Current   history   of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04(B)-(C).


The Paragraph B criteria for Listing 12.06, which governs anxiety disorders, are the same as those listed above, while Paragraph C under 12.06 states that the impairment results "in complete inability to function independently outside the area of one's home."  20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.06(C).

The ALJ evaluated the Paragraph B criteria relying on Angeles's testimony, psychological testing performed by Trieger, and psychological treatment records.  (Tr. at 47.)  The ALJ decided that, although Angeles had moderate difficulties in daily living, social functioning, and concentration, none of her problems rose to the level of "marked."  (Tr. at 47-48.)   The ALJ then turned to the Paragraph C criteria, and found no evidence that Angeles  had  ever  had an episode of decompensation or that she was

unable to function outside of a highly supportive living environment.  (Tr. at 48.)

Angeles argues that the ALJ should have given more weight to Conklen's opinion that Angeles satisfied the listing criteria in 12.04, and to Conklen's treatment records, given the extent of the treating relationship between Conklen and Angeles.  Specifically, Angeles disputes the ALJ's characterization of her GAF scores as being in the 60-65 range.

An ALJ should give more weight to a treating source's medical opinions.  20 C.F.R. § 416.927(d)(2).  If the ALJ finds that the treating source's opinion is supported by the record, that opinion is given controlling weight.  Id.  However, a nurse practitioner does not qualify as an "acceptable medical source" under the Regulations, 20 C.F.R. §§ 416.913(a), 404.1513(a), and only an "acceptable medical source" can be considered a treating source "whose opinion may be entitled to controlling weight," SSR 06-03p.  Instead, a nurse practitioner is considered an "other source," whose opinion *may* be given consideration by the ALJ.  20 C.F.R. §§ 416.913(d)(1), 404.1513(d)(1); SSR 06-03p.

The Court rejects Angeles's contention that Conklen's 2006 opinion was entitled to controlling weight.  First, Angeles did not submit this record

to the ALJ until *after* the hearing in 2008, despite the fact that Conklen prepared it more than a year beforehand. Second, Conklen is not an "acceptable medical source" capable of being categorized as a "treating source." Therefore, Conklen's opinion was not eligible to be given "controlling weight" under the Regulations.

There is substantial evidence that the ALJ gave the records of Angeles's treatment with Conklen consideration in making her determination that Angeles is not disabled for SSI and DIB purposes. The ALJ made several references to records generated by Angeles's mental healthcare providers. (Tr. at 47, 50.) The ALJ evaluated the treatment records and determined that Angeles's "allegations [were] out of proportion to the observations and assessment of her nurse." (Tr. at 50.)

With relation to the GAF scores, the ALJ specifically found that Conklen's assignment of GAF scores was unreliable because the lower scores were inconsistent with Conklen's narrative record indicating that Angeles was improving. (Id.) This conclusion is supported by Conklen's records; for example, on August 3, 2006, although Angeles indicated being tired and forgetful, she told Conklen that she was "doing pretty good" and was sleeping well for the most part. (Tr. at 29.) Conklen noted that

Angeles's mood was good, found that her affect was "of appropriate range and intensity," and determined that Angeles did not appear to be a danger to others or herself. (Id.) Nonetheless, Conklen assigned Angeles a GAF score of 50 (id.), ten points lower than the score of 60 she gave Angeles on March 1, 2005, when Angeles reported lots of stress and chronic inability to sleep (Tr. at 19). Given that this discrepancy is not anomalous, the ALJ was justified in not relying on Conklen's GAF-score determinations.

Finally, the ALJ took into consideration the opinions of two doctors of clinical psychology licensed in their field, both of whom qualify as "acceptable medical sources." See 20 C.F.R. §§ 416.913(a)(2), 404.1513(a)(2). In particular, the ALJ gave Dr. Wharton's opinion great weight, finding Dr. Wharton's assessment that Angeles's anxiety and depression only moderately, as opposed to markedly, restricted Angeles's activities " well reasoned and consistent with the medical evidence." (Tr. at 51.) Dr. Wharton found that Angeles satisfied neither the Paragraph B nor paragraph C criteria in relation to Listings 12.04 and 12.06. (Tr. at 287-88.)

The Court finds that, given the foregoing, the ALJ's decision that Angeles was not disabled for SSI and DBI purposes was supported by

substantial evidence.

## II.   ERRONEOUS FUNCTIONAL CAPACITY DETERMINATION

Plaintiff's next argument is that the ALJ's determination of Angeles's RFC was "misleading and incorrect as he [sic] based it on her own judgment and the claimant's daily activities." (Br. 7.) Angeles argues that the ALJ relied too heavily on written records about Angeles's capability to engage in daily activities, and ignored Angeles's testimony at the hearing. She further asserts that the ALJ's assessment of Angeles's daily activities does not render her fit for full-time employment.

The ALJ based her conclusions on the medical record, Angeles's testimony, and the testimony of an independent vocational expert. (Tr. at 51.) She found that Angeles was incapable of performing work she had done in the past. (Id.) After reciting the relevant rules and guidelines, the ALJ held that, based on Angeles's RFC, age, education, and work experience, she was not disabled and that there were plenty of jobs in the national economy that she could perform without being exposed to fumes, pulmonary irritants, and that would not subject Angeles to more than occasional interaction with the public. (Tr. at 51-52.) These jobs

included a hand packer, sandwich maker, and day worker cleaner.  (Tr. at 52.)

An ALJ's credibility determination is entitled to "considerable weight," and thus a court will only overturn such a determination if it is "patently wrong." Kelley v. Sullivan, 890 F.2d 961, 964, 965 (7th Cir. 1989); Herr v. Sullivan, 912 F.2d 178, 182 (7th Cir. 1990).  Reversal is warranted only if the ALJ's credibility finding is "an observation or argument  that is unreasonable or unsupported . . . ." Sims v. Barnhart, 442 F.3d 536, 538 (7th Cir. 2006).

In this case, the ALJ found that the medical evidence provided by Conklen, Wharton, and Trieger did not support Angeles's testimony that she was unable to work or perform daily activities.  (Tr. at 50.)  In particular, the ALJ looked to Dr. Wharton's determination that Angeles's anxiety and depression imposed moderate, but not severe, limitations on Angeles's daily life and social functioning.  (Tr. at 51.)  Conklen's records indicated that the Plaintiff was making progress in coping with stressors in her life, and that her sleep problems were subsiding.  (Tr. at 294-95.)  Although Angeles maintains that the ALJ relied on outdated evidence, records from late 2007 indicate that the Plaintiff  had  lost  weight,  had

better sleeping habits, fewer panic attacks, and that she had become more outgoing and interactive with others. (Tr. at 362.)  Although Angeles did struggle with some seasonal depression, when asked where she was on meeting her goals on a scale from one to ten, Angeles indicated that she was an "eight."  (Tr. at 363, 366.)

In short, there is substantial evidence in the Record supporting the ALJ's decision regarding Angeles's RFC.  Therefore, the Court will not disturb that decision.

III.   <u>AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE</u>

Finally, Angeles asserts that the ALJ's findings were against the manifest weight of the evidence.  Angeles does not cite the Record, Regulations, or any case law to support this contention.  As discussed above, there is substantial evidence to support the ALJ's determinations in this case.  The Court finds that Angeles's third argument is cumulative of those raised above, and holds that it is likewise without merit.

THEREFORE, Plaintiff's Motion for Summary Reversal (d/e 14) is DENIED.  Defendant's request in the Response (d/e17) that the Court affirm the Commissioner's determination in this case is ALLOWED.  The decision of the Commissioner is AFFIRMED.  All pending motions are

DENIED as MOOT.  This case is closed.

ENTER:  September 23, 2009.

FOR THE COURT:

s/ Charles H. Evans
CHARLES H. EVANS
United States Magistrate Judge